Donald N. David (DD5222)
Brian A. Bloom (BB5722)
**AKERMAN SENTERFITT LLP**
335 Madison Avenue, Suite 2600
New York, New York 10017
<u>Telephone</u>: (212) 880-3800
<u>Facsimile</u>: (212) 880-8965

*Attorneys for Plaintiffs*
  *Lorenz Fischer-Zernin, Bruce Decker and*
    *Donald Duberstein*

**'08 CIV 5472**

**JUDGE BUCHWALD**



**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------------x
LORENZ FISCHER-ZERNIN,
BRUCE DECKER and
DONALD DUBERSTEIN,

                                    Plaintiffs,

          - against -

QUINTESS LLC and
CLUB HOLDINGS LLC,

                                    Defendants.
-----------------------------------------------------------------------x

Case No.: _____

**COMPLAINT**

<u>**Jury Trial Demanded**</u>

        Plaintiffs Lorenz Fischer-Zernin, Bruce Decker and Donald Duberstein ("plaintiffs"), by

and through their undersigned attorneys, Akerman Senterfitt LLP, for their complaint against

defendants Quintess LLC ("Quintess") and Club Holdings LLC ("Club Holdings" or "the Club")[1]

allege, upon information and belief, as follows:

<u>**Introduction**</u>

        1.        This is an action for a declaratory judgment, equitable relief and damages,

brought by the plaintiffs against Quintess and Club Holdings.

---

        [1]        Quintess and Club Holdings are sometimes collectively referred to as the "defendants".

2.      In this action, plaintiffs seek, *inter alia*, to enforce their "usage rights" under valid contracts which defendants have unilaterally refused to honor, and indicated they will not honor in the future, thus breaching and anticipatorily breaching those contracts. Pursuant to these "usage rights", which were granted to plaintiffs in connection with the funding by plaintiffs or associated entities of the critical initial equity investments in Club Holdings, plaintiffs have lifetime rights to use vacation properties operated by Club Holdings for 21 days per year on a space available basis. Defendants fraudulently induced plaintiffs to sign documents which defendants now claim give them the right to cancel plaintiffs' contractual rights at any time and for any reason.

3.      Due to defendants' unlawful refusal to honor plaintiffs' contractual rights, plaintiffs now seek (i) a declaratory judgment that the purported "membership agreement" signed in or about August, 2006, and the related "membership plan" (jointly the "Membership Documents"), are not valid contracts and that the "usage rights" received by plaintiffs as initial investors in the Club in 2004 remain in full force and effect, as confirmed to plaintiffs in a written communication from Club Holdings sent contemporaneously with the execution of the Membership Documents; (ii) specific performance under defendant's commitment to the parties entered into in 2004 (as a result of plaintiffs' investment in Club Holdings) by again allowing plaintiffs to make reservations for, and use, the Club's facilities; (iii) injunctive relief preventing defendants from wrongfully terminating plaintiffs' usage rights before the end of each plaintiff's life; (iv) rescission of the purported August, 2006, contracts; and (v) compensatory and punitive damages to be determined by a jury.

**The Parties**

4.     Plaintiff Lorenz Fischer-Zernin is a citizen of Germany.  He was a resident of New York during the events giving rise to plaintiffs' claim and is now domiciled in Switzerland.

5.     Plaintiff Bruce Decker is a citizen of the United States of America and of the State of Utah.  He is domiciled in Utah.

6.     Plaintiff Donald Duberstein is a citizen of the United States of America and of the State of New York.  He is domiciled in New York.

7.     Quintess is a limited liability company organized under the laws of the State of Delaware.  Quintess has its principal place of business at 11101 West 20th Avenue, Suite 300 in Broomfield, Colorado.  Quintess does substantial business in New York.

8.     Club Holdings, LLC is a limited liability company organized under the laws of the State of Delaware.  Club Holdings also has its principal place of business at 11101 West 20th Avenue, Suite 300 in Broomfield, Colorado.  Club Holdings does substantial business in New York.

**Jurisdiction and Venue**

9.     This Court has personal jurisdiction over defendants because, upon information and belief, they own and/or operate real property in the State of New York as part of their timeshare vacation business.  In addition, both defendants transact substantial business in the State of New York.  Therefore, defendants are subject to the personal jurisdiction of courts of the State of New York pursuant to N.Y. C.P.L.R. § 302(a).

10.     This court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because this action concerns a dispute between citizens of different states and also because it concerns a dispute between one citizen of a foreign state and citizens of a different State.  In

addition, each plaintiff's claims against defendants concern rights which exceed $75,000 in value.

11.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because defendants reside in New York. In addition, a substantial part of the events or omissions giving rise to these claims occurred in New York.

## **Background Facts**

12.    In 2004, plaintiffs or their associated entities (collectively, the "Investors") invested in Series A Shares of Club Holdings, a company created to own and operate a destination vacation club called Dreamcatcher Retreats ("Dreamcatcher").

13.    The Investors were the first investors to put significant money behind the Dreamcatcher project. In addition to the Investors' equity stakes, the Investors and plaintiffs were orally promised the opportunity to use Dreamcatcher's vacation homes on a space available basis. This promise formed part of the valuable consideration for plaintiffs' initial financial investment in Club Holdings.

14.    In or about October, 2004, Scott Anderson ("Anderson"), then president and CEO of Club Holdings, memorialized each plaintiff's usage rights ("usage rights") in letters to each plaintiff. According to Anderson's letters, plaintiffs' usage rights were to last until the end of their lives. Each plaintiff was entitled to use the Club's facilities for up to twenty-one (21) days per year without charge. Also according to Anderson's letters, no plaintiff was required to pay any fee or make any deposit in connection with his usage of the Club's facilities or properties. These usage rights were not identical to the rights of "members" of Dreamcatcher. See Exhibit A annexed hereto.

15.    Each plaintiff did, in fact, utilize the facilities during the period of time between October of 2004 and the year 2008.

16.    On or about August 25, 2006, Club Holdings, the owner of Dreamcatcher, entered into a business combination (the "Merger")[2] with Monogram Holdings LLC, which operated a competing destination club under the name of "Quintess". After the Merger, Defendants continued to operate the destination club under the name "Quintess".

17.    On the day prior to the Merger, on August 24, 2006, each plaintiff was sent an email by Mike McNamara, Dreamcatcher's VP & CFO ("McNamara"), accompanied by a letter from Anderson explaining that, as part of the Merger, Quintess had asked that Dreamcatcher receive a written acknowledgment of the usage rights from the Series A investors, a group which includes each plaintiff. A copy of this email is annexed as Exhibit B.

18.    The letters sent to the plaintiffs on August 24, 2006, were substantively identical, *i.e.*, they differed only in the names and addresses of the plaintiff recipients.

19.    Anderson's August 24, 2006, letter to plaintiff Lorenz Fischer-Zernin states, "As a Series A investor in Club Holdings, you are entitled to 21 days use per year of our properties with no payment of annual dues. These days can be reserved between 7 and 179 days of your arrival date. Your membership has no refund or termination value should you ever cease to be an investor in our company and the membership terminates upon your death." The August 24, 2006 letter went further still, assuring plaintiffs that following the Merger their "usage rights" would also cover Quintess properties and any additional properties acquired by the combined entity. See Exhibit C annexed hereto.

---

[2]    The business combination was technically a contribution of the assets (including subsidiary stock, one of which was Quintess LLC) of Monogram Holdings LLC to Club Holdings LLC. The parties have referred to this transaction as a "merger" throughout the present dispute and we continue that usage here to avoid confusion.

20.    Anderson went on to state that the "merger" was a "great step forward for our company" and ask plaintiffs to "complete the final steps by initialing the enclosed documents....no later than Friday."

21.    August 24, 2006, the date of Anderson's letter, was a Thursday, meaning Anderson asked plaintiffs to return the documents within approximately twenty-four (24) hours in order for the Merger to be completed by the scheduled closing date.

22.    The documents which Anderson enclosed and sent to each plaintiff with his August 24, 2006, letter were a standard Dreamcatcher Retreats membership agreement and a membership plan which had been manually redacted by defendants in several places (Exhibit D). For example, the "Term of Membership" provision (§4 of the membership agreement) had been crossed out, as had all references to the payment of deposits or dues (*e.g.*, §6), references to membership resignation, (§8) and various references to voluntary termination (*e.g.*, §9).

23.    None of the plaintiffs had seen the standardized "membership agreement" and "membership plan" before August 24, 2006.

24.    None of the plaintiffs were given sufficient time by defendants to consult an attorney before the requested return date.

25.    The Dreamcatcher Retreats Membership Documents did not fully describe the arrangement provided to the plaintiffs. For example, there was no mention of how many days were allotted to the plaintiffs nor was there an applicable reservation policy. Contrary to the Anderson letter of same date, the Membership Documents referred to a membership of 30 years. These details had however been clearly covered by Anderson's August 24, 2006 cover letter which plaintiffs therefore justifiably considered being part of the documentation.

{NY033346;1}                                    - 6 -

26.    McNamara represented to plaintiffs by email on August 24, 2006 that Quintess required, as a condition to the closing of the Merger, that each Series A investor execute a document acknowledging that their usage rights had no redemption value in case plaintiffs ceased being investors in the Club. For further information about the intended purpose of the Membership Documents, McNamara specifically referred to the fraudulent Anderson letter, and not the Membership Documents. Based on Anderson's August 24, 2006 letter and these additional representations, each plaintiff believed that the Membership Documents were intended merely to formalize their existing understandings concerning the scope of their "usage rights".

27.    Each plaintiff did not want to delay the Merger which was supposed to close the next day. Each plaintiff was advised that the Merger was subject to receipt of plaintiff's acknowledgment with regards to the usage rights and that it would benefit the company in which they had invested.

28.    Each plaintiff signed the redacted Membership Documents in good faith on or about August 24, 2006, and returned it to the defendants, as they had been directed to do.

29.    Nearly a year after the Merger, on or about July 6, 2007, each plaintiff received a letter (Exhibit E) from Bruce Barnet, chairman of Club Holdings, in which Barnet informed them that the management and board had decided to eliminate "honorary memberships and honorary membership usages" effective September 1, 2007. The letter leaves the impression that this decision was taken recently and does not refer to the fact that the decision to terminate plaintiffs' usage rights had already been taken in 2006.

30.    Plaintiffs immediately objected to Barnet's July 6, 2007, letter in writing. Upon plaintiffs' objection and their submission of Anderson's August 24, 2006, letter to Barnet (of which he claims he had not been aware), Barnet temporarily withdraw his July 6, 2007 letter.

31.    Another letter was sent to Series A investors, including plaintiffs, on or about December 28, 2007, from Peter Estler, CEO of Club Holdings (Exhibit F). This letter purported to give notice to each plaintiff that his "membership" would terminate in 60 days, *i.e.*, on February 29, 2008.

32.    The December 28, 2007 letter states that according to the Merger documentation which was negotiated by Anderson and McNamara during and before August 2006, plaintiffs' usage rights would expire 18 months after the Merger, notwithstanding the fact that Anderson had confirmed *just the opposite* to plaintiffs one day before the signing of these Merger documents. (Plaintiffs disagree with defendants' interpretation of the Merger documents and in any event are not parties to the Merger documents, were not aware of their contents at the time they signed the Membership Documents and are not bound by the terms of the Merger documents.)

33.    Despite written objection by the plaintiffs, defendants have refused to honor plaintiffs' contractual rights and instead claim that each plaintiff's "membership" and usage rights have ceased and been terminated.

34.    Each plaintiff would like to continue using the Club's facilities for vacation and recreation purposes.

35.    For a membership entitling the owner to twenty (20) days per year (one day fewer than plaintiffs have been granted since 2004 under their contract) at Club facilities, the Club presently requires a deposit of between $210,000 and $240,000 and payment of annual dues of $18,750.

## CAUSES OF ACTION

### First Cause of Action
(Declaratory Judgment)

36.     Plaintiffs repeat and incorporate herein by reference the allegations in paragraphs 1 through 35 above.

37.     The parties have valid contracts the terms of which are memorialized in the October 12, 2004, letter from Anderson to plaintiffs which set forth the "usage rights" to which plaintiffs are entitled for the remainder of their lives (to be terminated only upon death). These terms were reaffirmed in Anderson's August 24, 2006 letter to plaintiffs.

38.     The documents which each plaintiff signed on or about August 24, 2006, are not valid and binding contracts.

39.     Defendants claim that the documents signed on August 24, 2006 are valid and binding contracts.

40.     There was no consideration given by defendants in exchange for what defendants claim was plaintiffs' agreement to the terms of the August 24, 2006, Membership Documents in which plaintiffs supposedly gave the defendants the right to cancel their lifelong usage rights.

41.     There was no meeting of the minds between the parties, or any of them, in August, 2006; therefore, the Membership Documents signed by plaintiffs are unenforceable.

42.     Plaintiffs only signed the Membership Documents in August, 2006, because they were given a specific acknowledgment of their lifelong usage rights by defendants' agents, Anderson and McNamara, inadequate time to review the Membership Documents and reflect on them and because they were pressured to do so by defendants' agents, Anderson and McNamara. Therefore, no contract was formed because plaintiffs' signatures were procured under duress.

43.    Because the parties contemporaneously agreed that the Membership Documents would have no effect on plaintiffs' usage rights, any provision to the contrary in the Membership Documents must be viewed as a scrivener's error and disregarded.

44.    There is a real and justiciable controversy as to whether a contract between plaintiffs, or any of them, and defendants came into existence in August, 2006.

45.    There is a real and justiciable controversy as to the terms of any contract between plaintiffs, or any of them, and defendants that may have come into existence in August, 2006.

46.    There is a real and justiciable controversy as to whether plaintiffs' "usage rights" remain in effect.

47.    Plaintiffs are entitled to a judgment declaring that no contract, or modification of a contract in derogation of plaintiffs' "usage rights", came into existence between them, or any of them, and defendants in August, 2006, and that the "usage rights" remain in effect and binding.

## Second Cause of Action
(Breach of Contract)

48.    Plaintiffs repeat and incorporate herein by reference the allegations in paragraphs 1 through 47 above.

49.    When plaintiffs or their associated entities each invested as a Series A investor in the Dreamcatcher project in 2004, each Investor bargained for "usage rights" . The promise of these usage rights positively affected the Investors' decision to invest in Club Holdings.

50.    In his letter dated October 12, 2004, Anderson put into writing the plaintiffs' right to the lifelong use of the Club's vacation houses for 21 days per year.

51.    Defendants honored each plaintiff's contractual usage rights from 2004 until 2008.

52.    Defendants now refuse to honor plaintiffs' usage rights in violation of valid contracts with plaintiffs.

53.     As a result of defendants' breach, each plaintiff has been deprived of his right to use Club Holdings' facilities, and has otherwise sustained substantial monetary damages.

54.     By reason thereof, defendants are liable to pay to each plaintiff the damages that each has incurred as a result of such breach, in amounts to be proven at trial.

### Third Cause of Action
(Fraud)

55.     Plaintiffs repeat and incorporate herein by reference the allegations in paragraphs 1 through 54 above.

56.     Scott Anderson's letter on behalf of Club Holdings dated August 24, 2006, included, among other things:

(a)     a representation of the terms of the plaintiffs' existing usage rights, *i.e.*, that such rights were lifelong, entitled each plaintiff to up to twenty-one (21) days of use of Club facilities and that each plaintiff did not have to pay either a membership deposit or annual dues for his entire life;

(b)     a representation that the enclosed Membership Documents were merely for the purpose of memorializing and reaffirming the existing contractual rights of plaintiffs as a formality required for the completion of the Merger of Club Holdings with the parent company of defendant Quintess LLC;

(c)     a representation that if any plaintiff did not sign the Membership Documents by the very next day such action might imperil the Merger and cause the Company harm.

57.     McNamara's email dated August 24, 2006 specifically refers to the Anderson letter of the same date (and not the Membership Documents) as providing the useful details with regards to their request that plaintiffs sign the Membership Documents.

58.     Defendants knew that the representations in Anderson's August 24, 2006 letter, in particular with regards to lifelong use of Club facilities, were false when the letter was written since defendants intended to assert that plaintiff's use of Club facilities could be terminated at will under the terms of the enclosed Membership Documents without cause or compensation.

59.     Defendants intended that plaintiffs, who did not know of the falsity of Anderson's representations in the August 24, 2006, letter, rely on those misrepresentations in deciding to sign the Membership Documents.

60.     On or about August 25, 2008, the Club Holdings and Quintess businesses were combined, and Anderson's August 24, 2006 letter solicited execution of the Membership Documents as a condition to the Merger. Defendants knew that by sending the Membership Documents to plaintiffs only one day before the Merger, plaintiffs would be deprived of the opportunity to diligently review the documents, discuss them with their attorneys and/or make any changes. This was a premeditated plan of action to defraud the plaintiffs by inducing them to sign the Membership Documents on the basis of the false representations contained in Anderson's letter.

61.     Defendants engaged in a plan to defraud plaintiffs of their valuable life usage rights.

62.     Plaintiffs each justifiably relied on the description of the Membership Documents, including the description of the documents' purpose, in the August 24, 2006, letter.

63.     The Membership Documents would not have provided a sufficient description of the "usage rights" without Anderson's accompanying cover letter. For example there was no indication of the number of days plaintiffs could use, nor of the reservation policy. Plaintiffs,

therefore, justifiably assumed that the August 24, 2006 letter, was an integral part of the description of their usage rights and no reason to doubt its validity.

64.    But for the representation in the August 24, 2006, letter, that the signing of the Membership Documents, drafted by defendants, was merely a memorialization of their existing contract rights, none of the plaintiffs herein would have signed the Membership Documents.

65.    Each plaintiff has been separately injured by defendants' misrepresentations in the August 24, 2006, letter, because defendants have claimed authority based on the signed Membership Documents, to dishonor and void each plaintiff's life rights to the usage of Club facilities.

66.    By reason of defendants' fraud and conspiracy, plaintiffs are entitled to compensatory damages, punitive damages and rescission of the purported contract represented by the Membership Documents.

<div align="center">

**Fourth Cause of Action**
(N.Y. General Business Law, § 349)

</div>

67.    Plaintiffs repeat and incorporate herein by reference the allegations in paragraphs 1 through 66 above.

68.    Defendants' conduct in inducing plaintiffs to sign the 2006 Membership Documents based on knowingly false representations constituted a deceptive business practice in violation of N.Y. General Business Law § 349.

69.    Each plaintiff has been injured by defendants' deceptive business practices; therefore, they are entitled to recover their actual damages and their reasonable attorney's fees.

{NY033346;1}                                    - 13 -

**Fifth Cause of Action**
(Breach of the Covenant of Good Faith and Fair Dealing)

70.     Plaintiffs repeat and incorporate herein by reference the allegations in paragraphs 1 through 69 above.

71.     Implicit in the 2004 contract (as in all contracts) is each party's covenant of good faith and fair dealing in the course of performance.

72.     Said covenant includes the pledge that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, and encompasses any promises that a reasonable person in the position of the promisee would be justified in understanding would be included.

73.     Defendants breached the covenant of good faith and fair dealing by deceiving the plaintiffs as to the nature of the Membership Documents which defendants asked plaintiff to sign and under duress and which defendants now construe as superseding the previous contracts formed in 2004.

74.     By reason thereof, defendants are liable to pay to each plaintiff the damages that each has incurred as a result of such breach, in amounts to be proven at trial.

**Sixth Cause of Action**
(Unjust Enrichment)

75.     Plaintiffs repeat and incorporate herein by reference the allegations in paragraphs 1 through 74 above.

76.     Plaintiffs received usage rights as part and parcel of the consideration for the financial investment of the Investors in Club Holdings in 2004.

77.     Plaintiffs' usage rights have a financial cost to defendants.

78.     By unilaterally terminating plaintiffs' usage rights, defendants have unjustly captured the value of those usage rights, value which properly belongs to plaintiffs..

79.     By reason thereof, defendants are liable to pay restitution to each plaintiff as a result of defendants' unjust enrichment at defendants' expense, in an amount to be proven at trial.

## Seventh Cause of Action
(Promissory Estoppel)

80.     In both 2004 and 2006, defendants promised plaintiffs that plaintiffs would enjoy lifetime usage rights in Club facilities.

81.     Plaintiffs reasonably relied on defendants' promises by using Club facilities for their vacations, thus choosing to limit their options for those vacations to Club facilities.

82.     The only way to avoid an injustice is to require defendants to honor their promise of lifetime usage rights in Club facilities to plaintiffs.

83.     Plaintiffs demand a trial by jury.

**WHEREFORE**, plaintiffs demand judgment as follows:

(a)     A declaratory judgment declaring that no contract between plaintiffs, or any of them, and defendants came into existence in August, 2006 or, alternatively, that the terms of any contract that came into existence did not operate to modify, or permit defendants' to subsequently modify, the scope of plaintiffs' usage rights;

(b)     Rescission of the purported contract under the Membership Documents signed in August, 2006, such that the parties are returned to the positions they occupied prior to that time;

(c)     Specific performance of defendants' obligation to honor each plaintiff's usage rights at Club facilities under the contract which went into effect in 2004;

(d)     Injunctive relief preventing defendants from terminating, without cause, each plaintiff's usage rights for the term of each plaintiff's life.

(e)     Restitution in an amount to be determined.

(f)     Compensatory damages in the amount of $1,000,000 for each plaintiff.

(g)     Punitive damages in an amount to be determined.

(h)     Plaintiffs' reasonable attorneys' fees and costs.

(i)     Any other relief which the Court deems just and proper.

Dated: New York, New York
   June 17, 2008

         **AKERMAN SENTERFITT LLP**

         *Attorneys for Plaintiffs*
          *Lorenz Fischer-Zernin, Bruce Decker and*
          *Donald Duberstein*

     By:   _____
          Donald N. David (DD5222)
          Brian A. Bloom (BB5722)

         335 Madison Avenue, Suite 2600
         New York, New York 10017
         <u>Telephone</u>: (212) 880-3800
         <u>Facsimile</u>:  (212) 880-8965

To:  Quintess LLC
    11101 West 20th Avenue, Suite 300
    Broomfield, CO 80021

    <u>AND</u>

    Club Holdings, LLC
    11101 West 20th Avenue, Suite 3000
    Broomfield, CO 80021

# Exhibit A

# CLUB HOLDINGS, LLC

SCOTT ANDERSON
PRESIDENT AND CEO

8400 East Crescent Parkway, Suite 475
Greenwood Village, Colorado 80111

Phone: 720-489-0720
Fax:   720-489-0729
E-mail: sanderson@clubholdings.com

October 12, 2004

Lorenz Fischer-Zernin
17 Boxwood Lane
Rye, NY 10580

Dear Lorenz,

As time draws near for our first home to come on line, I thought it might be useful to communicate with you on the usage rights available to you as a Series A Investor. As you know, your investment in Club Holdings, LLC does not include a membership in our club. However, since you made the decision to invest in our venture, the board has determined that you should receive certain rights to use the facilities of the Club.

You are invited to use the homes for 21 days per year on a space-available basis. Space Available Reservations may be made starting 179 days in advance of your arrival. These may be reserved in increments of 3 days or more, up to 21 days in any one home. In the short term (the next 40 days), reservations can be made by calling Penny Walls, your Club Personal Assistant, at (720) 240-2135. After that time, you may also visit our website for home availability and reservations. Penny will assist you in reserving your home of preference, as well as arranging any other vacation-related needs, such as air, car, recreation activities and restaurant reservations.

I have also enclosed our first newsletter, which features the first homes coming on line, as well as short biographies of the management team. All of us are excited about having our first visitors to these fine homes.

If Penny has not already called you, she will be doing so in the next few days to chat with you about your vacation interests, family interests and personal preferences.

As always, feel free to call me at any time with any questions you may have about reservations or our homes.

Sincerely,
    Scott Anderson

# Exhibit B

Subj:     **Series A Dream Catcher usage rights**
Date:     8/24/2006 1:29:54 P.M. Eastern Standard Time
From:     mmcnamara@dcr.com
To:       Lzernin@aol.com

Lorenz, I think you are aware of the upcoming merger with Quintess. If not, I'd be happy to discuss it with you. As a condition of closing, Quintess has asked us to get each investor who has some usage rights in Dream Catcher to sign an agreement acknowledging that—in particular that you do not have the right to any payment for that membership should you cease to be an investor. The attached letter from Scott provides useful details.

Can you initial and sign the Membership Agreement attached and fax it back to me at the number below? If possible, I'd like to get this back tomorrow or Monday. Thanks.

**Mike McNamara**
Vice President & Chief Financial Officer
Dream Catcher Retreats
8400 East Crescent Parkway
Suite 475
Greenwood Village, CO 80111
Phone: 720-240-2142
Fax: 720-489-0729
Toll Free: 1-866-690-7821
mmcnamara@dcr.com

# Exhibit C

August 24, 2006

Lorenz Fischer-Zernin
17 Boxwood Lane
Rye, NY 10580

Dear Lorenz,

On Friday, August 18, 2006, Club Holdings, LLC signed an acquisition agreement with Monogram Holdings, the parent company of Quintess—a destination club much like our Dream Catcher Retreats club. As investors, you will be receiving additional information about the transaction and its effects on your equity investment.

As a condition to closing the transaction, Quintess has asked me to put in writing the verbal agreements Dream Catcher has with you regarding use of Dream Catcher properties. As a Series A investor in Club Holdings, you are entitled to 21 days use per year of our properties with no payment of annual dues. These days can be reserved between 7 and 179 days of your arrival date. Your membership has no refund or termination value should you ever cease to be an investor in our company and the membership terminates upon your death.

Beginning in late Fall, you will have access to Quintess's current properties and any new ones that the combined company opens. On our side, we are very close to purchases of a condo in the Carlyle in Miami and a replacement home for our leased La Quinta, CA property. Construction on our home in Canouan, again replacing a lease, is expected to finish in November with our home available as soon thereafter as we can get furniture delivered and set up. In addition to properties currently available in Cabo, Aspen, Paris, Napa and St. Thomas, among others, Quintess (www.quintess.com) will be opening homes in Lake Tahoe and Hawaii, and may add a 90+ foot sailboat to the combined portfolio.

This is a great step forward for our company, our club members and our investors. Please help us complete the final steps by initialing the enclosed documents, signing the membership agreement and faxing or mailing them to my attention. We are planning on closing the transaction with Quintess on Friday, August 25, 2006 so please return these signed documents no later than Friday.

Thanks for your ongoing support of Dream Catcher, particularly your valuable assistance in finding and enrolling new members. I know you will appreciate the combined strength of Dream Catcher/Quintess as club members and investors.

Sincerely,

Scott W. Anderson

Enclosures

# Exhibit D

# MEMBERSHIP AGREEMENT

The undersigned individual, referred to in this Membership Agreement (the "Agreement") as the "Member," or "I," "me" and other first-person pronouns, hereby enters into this Agreement effective as of the date set forth on the signature page below with Hemisphere Club Management, LLC, a Delaware limited liability company (the "Club Operator"), on behalf of Dream Catcher Retreats, a luxury vacation residence club (the "Club").

## INTRODUCTION

(a) The Club Operator, through affiliates and other associated parties, owns, leases and operates a portfolio of luxury vacation residences (the "Club Properties"), for use and enjoyment of the members ("Members") of the Club.

(b) The Club has invited the Member to join the Club and the Member desires to join the Club.

(c) The Member has read and completed the Club's Member/Associate Member Profile, and has read the Club's Membership Plan, Rules and Regulations, and this Agreement (collectively, with the Member/Associate Member Profile, the "Membership Documents"). The Member understands that these documents govern membership ("Membership") in the Club.

(d) As one of the Membership Documents, this Agreement sets forth certain of the terms of the Member's Membership in the Club ("Membership").

## AGREEMENT

NOW THEREFORE, for and in consideration of the mutual covenants and promises contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows: By executing this Agreement, I, the undersigned Member, hereby understand, acknowledge and agree that:

1. MEMBERSHIP. I accept the Club's invitation to become a Member of the Club

on the terms and conditions set forth in this Agreement and the other Membership Documents. I have reviewed and I understand all of the provisions of the Membership Documents, including payment and other responsibilities and obligations imposed on me. The Membership Documents constitute a legally binding obligation on me, and I have the capacity to enter into this Agreement, which also obligates me under the other Membership Documents. I agree to comply with my obligations as a Member under the Membership Documents as in effect from time to time.

2. MEMBERSHIP DEPOSIT AND ANNUAL DUES. Upon execution and delivery of this Agreement to the Club, I will pay the Membership Deposit and the applicable pro-rated Annual Dues to the Club in the amount set forth on the Membership Deposit and Annual Dues Schedule attached to this Agreement by check, wire transfer or bank draft against my bank account. On or before January 1st of each calendar year thereafter, I will pay the Annual Dues then in effect. The Club, in its sole discretion, may withdraw its invitation, and approval for my Membership at any time up to 30 days from the receipt of the Membership Deposit, for any reason or for no reason. The Club Operator will reflect Membership Deposits as a long-term liability on the Club Operator's books and records. Membership Deposits may be used only for the purpose set forth in the Membership Plan.

3. AGREEMENT TO PAY DUES, FEES AND CHARGES. I will pay the Annual Dues for my selected Membership category when due in accordance with the Membership Documents, by check, wire transfer or bank draft against my bank account. I understand that all invoices for amounts due by me to the Club, other than invoices for Annual Dues and the Membership Deposit, are payable upon receipt. I understand that the Club will use the bank account and credit card information provided in my Member/Associate Member Profile to draw drafts against my bank account or to charge the credit card listed, for the full amount of any incidental charges and any other amounts that my guests or I may owe to the Club, its affiliates, or the operators of any resort facilities, such as restaurants, spas, golf clubs, or ski areas, at which I may have charging privileges by virtue of being a Member.

DREAM CATCHER
RETREATS

VERSION 4.01

4. 30-DAY CANCELLATION RIGHTS.

4.1 I have the right to cancel this Agreement and my Membership in the Club for any reason upon written notice to the Club within 30 days after the acceptance by the Club of my Membership Deposit if I have not used any Club Properties during that period. If I do cancel this Agreement and my Membership in the Club within that 30-day period, the Club will refund the Membership Deposit and the Annual Dues that I have paid less an administrative fee equal to 2% of my Membership Deposit.

4.2 I understand the Club has the right to cancel this Agreement and terminate my Membership in the Club for any reason or no reason upon written notice to me within 30 days after the execution of this Agreement. If the Club does cancel this Agreement and terminates my Membership in the Club within the 30-day period, the Club will refund the Membership Deposit and Annual Dues that I have paid. The Club may offset any amounts I owe the Club for incidental charges or otherwise pursuant to the Membership Documents against the amount of my Membership Deposit and Annual Dues to be refunded to me.

4.3 The Release and Indemnification and the Confidentiality and Non-Disclosure Obligations in Section 14 and Section 15 below, respectively, will survive the cancellation of this Agreement.

5. MEMBERSHIP DEPOSIT REFUND. The Club will refund all or a portion of my Membership Deposit at the end of my Membership term or upon my earlier resignation or termination of my Membership only in accordance with the Membership Plan and the other Membership Documents, which include a deduction for any outstanding amounts I then owe to the Club. The Club's tender of the repayment of my Membership Deposit in accordance with the Membership Plan shall constitute a full and unconditional release of any liability, claim, demand, damage, action or cause of action arising under or related in any way to my Club Membership, use of Club Properties and the termination of my Membership privileges, if my Membership privileges have not already been terminated.

6. NO TAX REPRESENTATIONS. Neither the Club nor any of its affiliates, agents or employees has made any warranty, representation or statement concerning the tax consequences of Membership.

7. NO INVESTMENT. I am acquiring the Membership solely for personal, recreational use of the Club Properties. I am not joining the Club as an investment. Being a Member has no investment value. My Club Membership will not appreciate in value, nor do I have any expectation or understanding that it may or that I may receive any economic benefits from Membership.

8. NON-EQUITY MEMBERSHIP. Membership does not give me an equity, property or any other ownership interest in the Club, the Club Operator or any of the Club Properties, nor does it confer a vested or prescriptive right or easement to use the Club Properties. As a Member, I have no rights, interest or other entitlement in or to income, losses, profits, dividends, distributions, or appreciation of, any assets of the Club, the Club Operator, their respective affiliates, or any of the Club Properties. Rather, Membership represents only a revocable license and privilege to use Club Properties in accordance with the terms of the Membership Documents, as they may be amended from time to time in the sole discretion of the Club.

9. RESERVATIONS AND USE OF CLUB PROPERTIES. The Club Properties are not divided into use or occupancy periods or intervals of time. All reservations are arranged in accordance with the Membership Plan and the Rules and Regulations on a first-come, first-served basis, in common with the rights of other Members, as more fully described in the Membership Plan and the Rules and Regulations. Use and occupancy of the Club Properties are not based on a recurrent right to use or to occupy on an annual or some other periodic basis or for any specific period of time.

10. AMENDMENTS TO MEMBERSHIP DOCUMENTS; WAIVER OF PROVISIONS. The Club reserves the right, from time to time in its sole discretion, to amend or modify any of the Membership Documents or waive any of the provisions contained in the Membership Documents on a case-by-case basis.

11. TRANSFER OF MEMBERSHIP. I may not directly sell or transfer my Membership to any other party or allow any other party or allow any use of my Membership by another party that is inconsistent with the terms and conditions of this Agreement and the other Membership Documents. If I attempt to transfer or otherwise assign my Membership in violation of this provision or the other Membership Documents, I will be deemed to have voluntarily resigned from the Club and I will be subject to

DREAMCATCHER RETREATS

disciplinary actions by the Club as provided in the Membership Documents.

12. FACILITIES. As of the effective date of my Membership, all or portions of the Club Properties may not be constructed, or complete, and the Club's anticipated portfolio of Club Properties may not be complete. The Club, in its sole discretion, through the Club Operator and its affiliates, will manage the Club's proprietary portfolio, including the selection of Club locations, the acquisition by purchase or lease of Club Properties, and the disposition or substitution of Club Properties. I have no right in law or equity to limit, modify, curtail or halt any Club actions relating to its property portfolio.

13. LEGAL STRUCTURE. The Club reserves the right to modify the Membership Documents in order to comply with the laws of any particular state, or to obtain or preserve an exemption from regulation in any particular state. In this regard, the Club reserves the right to grant additional rights or impose limitations upon the rights of Members in some states that may be different from the rights of Members residing in other states. Furthermore, the Club reserves the right to create one or more alternative legal structures to comply with the laws of particular states. This may include the creation of affiliates or other entities related to the Club in which I, at no cost to me, may be designated as a non-equity shareholder, participant, or member. However, I would not be entitled to any compensation, appreciation, or other economic rights in such entities. I will execute any and all documents required to create, accomplish, accommodate, modify, terminate, or rescind any such legal relationship. I further empower the Club to act as my agent and attorney-in-fact on all such transactions that might be necessary under this paragraph.

14. RELEASE AND INDEMNIFICATION. The use of Club Properties by my guests and me and any privilege or service incident to my Club Membership is undertaken with my knowledge of the risk of possible injury, death, and/or loss or damage of personal property owned by my guests or me. I accept and assume any and all risk of injury and death to my guests and to me, and to the loss or damage of any of our personal property, sustained or incurred while using the Club Properties or any related services or amenities or while involved in any event or activity related to Club Membership. I will indemnify and hold harmless the Club Indemnitees, as defined below, against any and all losses, expenses, liens, claims, demands, and causes of action of every kind and character for death, personal injury, property

damage or any other liability, damages, fines or penalties, including costs, attorneys' fees and settlements, whether or not based on the acts or omissions of the Club or any other Club indemnitees which result from, arise out of, or in any way are connected with Membership or the use of the Club Properties by my guests or me, except to the extent that the same are the direct result of the gross negligence or willful misconduct of any Club indemnitees. As used in this paragraph, the term "Club indemnitees" shall include the Club, the Club Operator, the Club Properties, and their respective affiliates, agents, independent contractors, employees, members, officers, directors, owners and all persons, companies, corporations, partnerships, other entities, heirs, successors and assigns with which they are or may in the future become affiliated. This paragraph shall survive the termination of my Membership or the cancellation of this Agreement.

15. CONFIDENTIALITY AND NON-DISCLOSURE OBLIGATIONS. The Club uses and maintains proprietary and confidential systems and information ("Confidential Information"). Confidential information includes, but is not limited to, terms of my Membership or any other Member's Membership, the identity and any other information regarding Members, and any of the provisions of this Agreement and the other Membership Documents. I agree not to disclose Confidential Information to any third party, not to record or otherwise place any Membership Documents in the public record, and not to provide any of the Membership Documents or any copies, duplications, portions or summaries thereof to anyone other than (a) my spouse and professional advisors who will be advised of this confidentiality provision and will be subject to it; and (b) pursuant to a request or order to disclose under a subpoena, order or other instrument issued by a court of competent jurisdiction (or other legal authority), and then only after notifying the Club of the required disclosure. Violation of this paragraph will be deemed a serious violation of the terms of my Membership and will subject me to discipline as provided in the Membership Plan and the Rules and Regulations. I also acknowledge that (a) violation by me of any of the provisions of this paragraph could cause irreparable injury to the Club and its Members and (b) there is no adequate remedy at law for such violation. Accordingly, the Club shall have the right, in addition to any other remedies available to it at law or in equity, to enjoin me in any court of competent jurisdiction for violating or threatening to violate this paragraph. In the exercise of this injunctive remedy, the Club will be entitled to recover from me all associated costs (including reasonable attorneys' fees). This paragraph shall survive the term!

DREAM CATCHER
R E T R E A T S

VERSION 6.01

nation of my Membership or the cancellation of this Agreement.

16. ARBITRATION. Any controversy or claim arising out of or related to this Agreement or the Membership Documents or breach thereof may, at the Club's discretion, be submitted to and settled by binding arbitration in the City and County of Denver, Colorado, in accordance with the Commercial Arbitration Rules of the American Arbitration Association, before a panel of one arbitrator who is a former judge and who is affiliated with the Judicial Arbiter Group, Denver, Colorado. I agree to such arbitration if elected by the Club.

17. COSTS OF ENFORCEMENT; ATTORNEY FEES. I will be liable to the Club for any and all costs and expenses incurred by the Club to enforce any provisions of this Agreement and the other Membership Documents, including reasonable attorneys' fees.

18. GENERAL PROVISIONS.

18.1  NOTICES. Any notice required or permitted to be given under this Agreement and the Membership Documents shall be (a) in writing, and (b) delivered by one of the following means: (i) personal delivery; (ii) prepaid, overnight delivery or courier service; or (iii) by the United States Postal Service, first class, certified mail, return receipt requested, postage prepaid. All notices given under any of the Membership Documents shall be addressed to me at the address indicated in my Membership Application and, in the case of the Club, as follows:

Dream Catcher
8400 East Crescent Parkway, Suite 475
Greenwood Village, CO 80111
Attention: Chief Financial Officer

The Club or I may change our respective addresses to such other address of which we advise the other party in writing by any of the above-described means. Notice shall be effective on delivery, or, in the case of a rejection or refusal to accept delivery or the inability to deliver due to a changed address not provided in accordance with this Agreement, upon attempted delivery. Notice of change of address shall be effective ten (10) days after the date of delivery of such

notice.

18.2  ENTIRE AGREEMENT. This Agreement, together with the other Membership Documents, constitutes the entire agreement and understanding with respect to my Membership and the other matters set forth in this Agreement and the other Membership Documents. This Agreement and the other Membership Documents are the complete and exclusive statement of the terms hereof and thereof, superseding all prior or contemporaneous agreements, representations, promises and understandings, whether written or oral. No person has been authorized to give any information or make any representations, whether written or oral, not contained in this Agreement or the other Membership Documents and, if given or made, I have not relied upon any such information or representation as having been authorized by the Club. All exhibits and schedules referenced in the Membership Documents are incorporated herein by reference.

18.3  SUCCESSORS AND ASSIGNS. The Membership Documents shall be binding upon and inure to the benefit of the heirs, executors, administrators, legatees, distributees, legal representatives, successors and permitted assigns of the Club, the Club Operator, and me. I may not assign this Agreement or any of the other Membership Documents, and any attempt to do so shall be null and void. The Club may assign this Agreement to any of its affiliates or any other organization that owns or controls, is owned or controlled by, or is under common ownership or control with, the Club.

18.4  CAPTIONS AND HEADINGS. Captions and paragraph headings used in this Agreement are for convenience of reference only and shall not be used to interpret any provision hereof.

18.5  GOVERNING LAW. This Agreement shall be governed by, interpreted and enforced in accordance with the laws of the State of Colorado and any and all claims arising out of the relationship between the parties shall be governed by the laws of the State of Colorado without regard to the principles of conflicts of laws thereof.

DREAM CATCHER
RETREATS

18.6  SEVERABILITY. Any provision of this Agreement or the other Membership Documents held or determined by a court of competent jurisdiction (or other legal authority) to be illegal, invalid, or unenforceable in any jurisdiction shall be deemed separate, distinct and independent, and shall be ineffective to the extent of such holding or determination and such Membership Document shall be interpreted as if said provision had never been a part of such Membership Document without (a) invalidating the remaining provisions of such Membership Document in that jurisdiction or (b) affecting the legality, validity or enforceability of such provision in any other jurisdiction.

18.7  FORCE MAJEURE. The Club will not be held liable for failure to perform or delay in performing any of its obligations hereunder or under the other Membership Documents, including the provision of any Club Properties, where such failure or delay is due to a strike, lockout or other labor troubles; war, act of terrorism, civil unrest or other national emergency; an order or regulation of or by any governmental authority; fire, flood, unusually severe weather or other act of God; failure of supply, or inability by the exercise of reasonable diligence to obtain, fuel, supplies, parts or labor; or any other cause, similar or dissimilar, that is beyond the Club's reasonable control. If the Club's performance is affected by any such force majeure that will impact my reserved use of any Club Property, the Club shall give reasonably prompt notice to me of the occurrence or circumstance causing such force majeure. If I am unable to use a reservation at a Club Property due to any such force majeure, I may use the affected reserved days under my Membership at another Club Property during the then-current calendar year, subject to availability.

18.8  COUNTERPARTS. This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which taken together shall constitute one and the same instrument, binding on the Club and me.

18.9  EFFECTIVE DATE. The effective date of this Agreement shall be as of the first day of the month after the date of the Club's execution of this Agreement set forth below. The Club will only execute this Agreement if I have signed this Agreement and sent it to the Club accompanied by payment for my required Membership Deposit and Initial Annual Dues and I have satisfied any other conditions of Membership. I will not be considered a Member or receive any

Membership privileges until the Club has executed this Agreement. Facsimile transmission of a signed original of this Agreement and/or retransmission of any signed facsimile transmission shall be the same as delivery of an original. A party transmitting an originally executed signature page by facsimile will deliver the original signature page promptly thereafter; and, in any event, upon the request of the other party.

EVERY PERSON WHO DESIRES TO OBTAIN A CLUB MEMBERSHIP SHOULD CAREFULLY READ AND MAKE SURE THEY UNDERSTAND THIS MEMBERSHIP AGREEMENT AND THE OTHER MEMBERSHIP DOCUMENTS. THE CLUB ENCOURAGES POTENTIAL MEMBERS TO CONSULT THEIR PROFESSIONAL ADVISORS TO ASSIST WITH ANY TAX, LEGAL OR OTHER IMPLICATIONS OF THE MEMBERSHIP DOCUMENTS AND CLUB MEMBERSHIP. MEMBERS ARE RESPONSIBLE FOR PAYING ANY SALES OR OTHER TAXES THAT MAY BE PAYABLE ON THE MEMBERSHIP DEPOSIT, ANNUAL DUES, AND ANY OTHER AMOUNTS OWED TO THE CLUB FROM TIME TO TIME.

IN WITNESS WHEREOF, the Member has executed and the Club has caused its duly authorized representative to execute this Agreement to be effective as of NOVEMBER 1, 2004 TO BE COMPLETED BY THE CLUB).

MEMBER:

Name: LORENZ FISCHER- BERWIN
Address: 19 BOXWOOD LANE
         RYE, NY 10580

AGREED AND ACCEPTED:

DREAM CATCHER RETREATS
By: Hemisphere Club Management, LLC
By: _____
Name: _____
                    Its: _____

DREAM CATCHER
RETREATS

MEMBERSHIP DEPOSIT AND ANNUAL DUES SCHEDULE

A.  Membership Deposit                                                        $

B.  Member Category:
    (Unlimited, 15 day, Corporate, Customized)

C.  Annual Dues Now Due                                                       $

D.  Additional Days Purchased

E.  Additional Days Fees                                                      $

    Total Now Due (A+C+E)                                                     $

DREAM CATCHER℠
R E T R E A T S

VERSION 6.01

PAGE 6 OF 6

# MEMBERSHIP PLAN

## 1. INTRODUCTION

Hemisphere Club Management, LLC, a Delaware limited liability company (the "Club Operator"), operates a luxury vacation residence club, called Dream Catcher Retreats (the "Club"), for the use and enjoyment of our members ("Members"). The Club's residences are and will be located in some of the most desirable vacation destinations in the United States and internationally (the "Club Properties"). This Club Membership Plan covers various Club membership matters, including admission to and resignation from the Club.

The Club reserves the right, from time to time and in its sole discretion, to amend or modify this Club Membership Plan or to waive any of its provisions on a case-by-case basis.

## 2. PLAN EXECUTIVE SUMMARY

PURPOSE. This Club Membership Plan, the related Rules and Regulations, Membership Agreement, and Member/Associate Member Profile (collectively, the "Membership Documents") offer you an opportunity to become a member (a "Member") of the Club by acquiring a non-equity Club membership to use the Club Properties, facilities and amenities ("Membership").

OWNERSHIP AND OPERATION OF THE CLUB. The Club Operator and its affiliates own, lease and/or operate the Club Properties as described more fully in this Club Membership Plan.

USE OF CLUB PROPERTIES. Use of the Club Properties will be available to Club Members and guests of Members subject to the Rules and Regulations. Also, from time to time the Club and its affiliates may utilize Club Properties for business or promotional purposes.

MEMBERSHIP DOCUMENTS. If you have any questions concerning this Club Membership Plan or the other Membership Documents or Membership opportunities, please contact a Membership Director. Every person who desires to apply for Membership should carefully read all of the Club Membership Documents and is encouraged to seek professional advice in evaluating Club Membership Documents and the ramifications of Membership.

APPLICATION. Membership is by invitation only.

RELY ONLY ON THE MEMBERSHIP DOCUMENTS. Any representation not contained in the Membership Plan or the other Membership Documents is unauthorized, and if given or made, such information or representation must not be relied upon as having been authorized by the Club.

MEMBERSHIPS IN THE CLUB ARE OFFERED ONLY FOR RECREATIONAL PURPOSES. Memberships provide only the right to recreational use of the Club Properties. Memberships do not give a Member a vested, continuing or prescriptive right or easement to use the Club Properties. Memberships should not be viewed or acquired as an investment and no person purchasing a Membership will, nor should expect to, derive any economic profits or other benefits from Membership. Membership does not provide the Member with an equity or ownership interest or any other property, profits or economic interest in the Club, the Club Operator or the Club Properties.

THE CLUB IS NOT REGISTERED WITH ANY GOVERNMENTAL AUTHORITY. This document is prepared and issued by the Club. It is not prepared, registered with document or issued by any federal, state, county, or municipal agency, board, or commission, nor has any such body endorsed or judged the merits or value, if any, of the Membership Documents of the Club.

## 3. MEMBERSHIP AND MEMBER CATEGORIES

MEMBERSHIP CATEGORIES. The Club currently offers four categories of

DREAM CATCHER RETREATS

Membership; the Unlimited Plan, the 15 Day Plan, the Corporate Plan and the Customized Plans.

(a) UNLIMITED PLAN: Under the Unlimited Plan Membership, a Member has the right to use Club Properties for 30 or more days per year, dependent on the Annual Dues paid by the Member and subject to the terms and conditions described in the Rules and Regulations. A 30-day Unlimited Plan includes 15 days of "Advanced Reservations," which can be reserved between 180 days and 365 days before the desired arrival date and 15 days of "Short Term Reservations," which are reserved between 7 and 179 days of the desired arrival date. Each Advanced Reservation and Short Term Reservation must be for a minimum of 3 nights. The number of Advanced Reservation days and Short Term Reservation days are adjusted pro-rata should the Member purchase more than 30 days at the start of a membership or of any given calendar year. The Unlimited Plan Membership also allows a Member to purchase an unlimited number of additional days, as more fully described in the Rules and Regulations. Unlimited Plan Members are guaranteed their first priority holiday once in each four-year cycle.

(b) 15-DAY PLAN: Under the 15 Day Plan Membership, a Member has the right to use Club Properties for a total of 15 days per year, subject to the terms and conditions described in the Rules and Regulations. This includes 7 days of "Advanced Reservations," which can be reserved between 180 days and 365 days before the desired arrival date and 8 days of "Short Term Reservations," which are reserved between 7 and 179 days of the desired arrival date. Each Advanced Reservation and Short Term Reservation must be reserved for a minimum of 3 nights. The 15 Day Plan Membership allows a Member to purchase additional days, up to 30 in total, as more fully described in the Rules and Regulations.

(c) CORPORATE PLAN: Under the Corporate Plan Membership, a registered Company, Corporation or Partnership has the right to use Club Properties for 30 days per year, subject to terms and conditions described in the Rules and Regulations. This includes 15 days of "Advanced Reservations," which can be reserved between 180 days and 365 days before the desired arrival date and 15 days of "Short Term Reservations," which are reserved

between 7 and 179 days of the desired arrival date. Each Advanced Reservation and Short Term Reservation must be reserved for a minimum of 3 nights. The Corporate Membership allows a Member to purchase 10 additional days, up to 40 in total, as more fully described in the Rules and Regulations.

(c) CUSTOMIZED PLANS: Under a Customized Plan Membership, a Member has the right to use Club Properties for a total of 15 days per year, subject to the terms and conditions described in the Rules and Regulations. This includes 7 days of "Advanced Reservations," which can be reserved between 180 days and 365 days before the desired arrival date and 8 days of "Short Term Reservations," which are reserved between 7 and 179 days of the desired arrival date. Each Advanced Reservation and Short Term Reservation must be reserved for a minimum of 3 nights. The Customized Plan Membership allows a Member to purchase 5 additional days, up to 20 in total, as more fully described in the Rules and Regulations.

Reservations procedures, policies, rules and fees for the Membership categories are described in the Rules and Regulations and the other Membership Documents.

MEMBERSHIP STRUCTURE: The Club has the following Membership structure:

(a) THE MEMBER. The "Member" is the person who applies for and is approved for Membership in the Club. The Member is responsible for paying the applicable Membership Deposit, Annual Dues, and other fees and amounts payable to the Club.

(b) ASSOCIATE MEMBERS. A Member may designate his or her spouse, common law spouse, or domestic partner (each, a "Partner") as an "Associate Member" of the Club either at or any time after the Member joins to the Club. Persons requesting treatment by the Club as domestic partners must be recognized as such in the jurisdiction where they live or if such unions are not recognized in the jurisdiction, the Partners must meet all the following criteria: (i) they have lived together for at least 6 months; (ii) the Partners share mutual responsibility for each other's

DREAM CATCHER
RETREATS

financial welfare; (iii) the Partners are not blood relatives; (iv) both Partners are at least 18 years of age and one partner is at least 25 years of age; (v) the Partners deem themselves life partners and would legally marry if that was allowed; (vi) neither of the Partners is legally married to someone else.

A Member may remove an Associate Member as such at any time by giving written notice to the Club. An Associate Member has the same rights and obligations as a Member. However, the Member shall at all times remain responsible for payment of any and all amounts due or otherwise incurred by the Associate Member and for assuring the Associate Member's compliance with the Club's policies, procedures, rules and regulations, as amended and modified from time to time.

The appointment of Associate Members and the rights and obligations of Associate Members may be subject to review, approval or modification by the Club as it considers appropriate from time to time in its sole discretion.

An Associate Member's rights in the Club will automatically terminate at the same time as termination of the applicable Member's Membership. In addition, an Associate Member's rights in the Club will terminate upon the Associate Member's divorce or legal separation from the Member, subject to Section 9 below.

Any disciplinary action imposed on a Member under the Rules and Regulations shall automatically apply to the Associate Member.

HONORARY MEMBERS. The Club may, for reasons it deems appropriate in its sole discretion, provide a limited number of "Honorary Memberships." Each Honorary Membership will have rights and obligations as the Club determines.

CHANGES TO MEMBERSHIP CATEGORIES AND MEMBERSHIP STRUCTURE. The Club may modify or change its Membership categories and Membership structure from time to time in its sole discretion. Any modification or change will become effective as of the beginning of the next calendar year, unless the Club determines that the modification or change should become effective sooner in the interest of the health, safety, welfare, and reputation of the Members or

the Club or is otherwise in the best interests of the Members or the Club.

## 4. PRIVILEGES OF MEMBERSHIP

USE OF CLUB PROPERTIES. The Members are entitled to use and enjoy the Club Properties subject to the provisions of the Membership Documents. Members of the Club do not have any equity ownership interest in the Club, the Club Operator or any other limited liability company affiliated or associated with use the Club Properties, or a vested or prescriptive right or easement to use the Club Properties. Members are not to be considered "members" of the Club Operator, as the term "member" is defined under applicable laws relating to limited liability companies.

TERM OF MEMBERSHIP. A Member's membership in the Club ("Membership") is for a 30-year term, unless the Member or the Club terminates the Membership sooner in accordance with this Membership Plan and the Rules and Regulations. If the Member maintains his or her Membership for the full 30-year term, the Club will refund the Membership Deposit to that Member in accordance with Section 9 below.

## 5. APPLYING FOR CLUB MEMBERSHIP

APPLYING FOR MEMBERSHIP. After reviewing information regarding the Club and discussing Club Membership with a Membership Director, if you are interested in becoming a Member and have been provisionally qualified by the Club, you may be asked to join the Club.

ENROLLMENT PROCESS. The Club may require an in-person or telephonic interview and may request information in addition to that disclosed on the Member/ Associate Member Profile. The Club has the right to determine, in its sole discretion, all matters relating to qualification for Membership.

Acceptance may be subject to verification of credit and other references. If your application for membership has been accepted, you will also be advised whether you have been accepted for immediate Membership or, if no Memberships are currently available, placed on the Club's waiting list. If your application is

D R E A M   C A T C H E R™
R E T R E A T S

accepted for immediate Membership and you want to join the Club, you must sign and return to the Club a Membership Agreement accompanied by the Membership Deposit, plus your applicable Annual Dues for the first twelve (12) months of your membership.

WAITING LIST. If you are placed on the waiting list, the Club will require 50% of your Membership Deposit and apply it against your remaining Membership Deposit when you clear the waiting list and join the Club. However, you can remove yourself from the waiting list at any time and receive a refund of your deposit, without interest. You may reapply for admission to the Club in the future.

NON-DISCRIMINATION. The Club will not discriminate in any manner against any Member, family member or other guest of a Member, or any prospective Member or his or her family on account of race, sex, religion, color, national origin, age, disability, sexual preference, marital status or status as a veteran.

## 6. MEMBERSHIP DEPOSIT, ANNUAL DUES, AND OTHER CHARGES

MEMBERSHIP DEPOSIT. Every new Member must pay a Membership Deposit to the Club in connection with the Member's signed Membership Agreement and joining the Club. The amount of the Membership Deposit (the "Membership Deposit"). The amount of the the Membership Agreement. Will be determined in the sole discretion of the Club from Membership Deposit will be determined in the sole discretion of the Club from time to time.

ANNUAL DUES. Each Member is required to pay Annual Membership dues ("Base Annual Dues") applicable to the Member's Membership Category. Base Annual Dues for the number of months remaining in the current calendar year are due and payable with the Member's executed Membership Agreement. The Member may be eligible to purchase additional days as more fully described in the Rules and Regulations. On or before January 1st of each calendar year thereafter, the Member must pay Base Annual Dues then in effect. The Club will not execute the Member's Membership Agreement unless it has received the applicable Annual Dues. Annual Dues will be billed in December of each year and

will be due and payable in advance on the first day of January.

(a) The Initial Annual Dues are as set forth on each Member's Membership Deposit and Annual Dues Schedule, which is a part of the Membership Agreement. The Club may adjust the Base Annual Dues from time to time at its discretion, to be applicable for the following Membership year. On an annual basis, the maximum percentage increase in Base Annual Dues will not exceed 2.5% plus the percentage change in the Consumer Price Index for Urban Consumers (U.S. City Average, All Items (1982-84=100)) for the 12-month period ending October 31 of the immediately preceding calendar year. However, the Club may adjust the Base Annual Dues at its discretion without any limitation every five years. The Club will provide notice of any Base Annual Dues adjustment at least thirty (30) days before dues are payable for the year in which the adjustment becomes effective.

(b) Base Annual Dues will not be reduced or suspended for any reason—including a Member's financial hardship, disability, failure to use Club Properties to the extent permitted by the Member's Membership category, or temporary unavailability of all or any number of the Club Properties.

INCIDENTAL AND OTHER CHARGES. Members are required to pay Incidental and other charges for certain special services requested by the Member. More information regarding Incidental and other charges is provided in the Rules and Regulations.

NO OTHER ASSESSMENTS OF MEMBERS. Other than the Annual Dues and other charges described in the Membership Documents, Members will not be subject to any liability for capital or operating assessments for the costs and expenses of ownership or operation of the Club or Club Properties or use of Club Properties.

RULES AND REGULATIONS.The Rules and Regulations contain important additional information regarding Incidental dues and fees and other amounts incurred in connection with Membership and use of Club Properties and related payment obligations.

DREAM CATCHER RETREATS

TAX CONSEQUENCES OF CLUB MEMBERSHIP. Members are encouraged to seek advice from their own tax advisors regarding the federal, state or local tax consequences of becoming and being a Member and with respect to Membership Deposits, Annual Dues and other charges paid to the Club. The Club does not provide tax advice or opinions to Members and makes no representations regarding any tax consequences to any Member.

## 7. PROHIBITION ON TRANSFER OF MEMBERSHIPS

No Member may sell, transfer, assign, pledge, hypothecate or otherwise encumber, directly or indirectly, a Membership. Any attempt to do so will be null and void and shall be deemed a submission of a resignation notice to the Club in accordance with Section 8 below.

## 8. MEMBERSHIP RESIGNATION

Members may only resign from the Club in accordance with the procedures described in this Section 8. Under certain circumstances, however, the Club may require a Member to resign or may terminate the Member's Membership in accordance with Section 9 below and the disciplinary procedures set forth in the Rules and Regulations.

NOTICE OF RESIGNATION. Any Member may resign from the Club within 30 days of becoming a Member and receive a full refund of amounts paid, less an administrative fee equal to 2% of the Membership Deposit, if the Member has not used any Club Properties during that time. Thereafter, a Member may not resign from the Club until two years after the date that the Member's Membership became effective. After this two-year period, a Member who wants to resign from the Club must deliver a written notice to the Club. A Members who has delivered a resignation notice shall continue to pay plan Annual Dues and incidental charges and shall continue to pay Annual Dues and incidental charges and shall continue to have full access rights to Club Properties until the effective date of the Member's resignation, as described below.

RESIGNATION PROCESS. After the Club receives a Member's resignation notice, the Member will be placed on the Club's resignation list in order of receipt of the

Member's resignation notice. Resignation from the Club will become effective on the date of the sale of the fourth Membership after the Member has reached the top of the resignation list, which includes full receipt of the applicable fourth new Member's Membership Deposit. However, if the Club has a waiting list for new Members, resignation will become effective after the first sale of a new Members, has reached the top of the resignation list. If the Member has received the Member's resignation notice in accordance with this Club has received that Member's resignation notice in accordance with this Section 8, the resignation will, in any event, become effective on the anniversary of delivery of the Member's resignation notice in accordance with Club policies.

REFUND OF MEMBERSHIP DEPOSIT LESS RESIGNATION FEE UPON RESIGNATION. When a Member's resignation is effective, the Club will refund to the Member an amount equal to that Member's Membership Deposit, less a resignation fee equal to 20% of that amount (the "Resignation Fee"). In addition, the Club may deduct any amounts owed by the Member to the Club as of the resignation effective date, including interest on past due amounts.

## 9. TERMINATION OF MEMBERSHIP

THIRTY YEAR TERM; REFUND OF MEMBERSHIP DEPOSIT. Membership in the Club shall be for a term beginning on the first of the month following the Club's receipt of the fully executed Membership Agreement and the Membership Deposit and ending 30 years from that date, subject to earlier resignation under Section 8 or involuntary termination as described below. If the Member maintains his or her Membership for the full 30-year term, the Club will promptly refund the entire Membership Deposit to the Member, less any past-due amounts, including late fees or interest, then owed to the Club. If any Member wants to rejoin the Club at the end of their 30-year term, the Member must submit a new Application for Membership and walk at least 30 days after termination of the Member's original 30-year term. However, the Member will not be subject to any waiting list that may exist. In addition, the Member will be entitled to a discounted Membership Deposit equal to 80% of the Membership Deposit applicable at such time. This new Membership will be subject to all other Membership terms contained in the Membership Documents as in effect at that time and from time to time thereafter.

DREAM CATCHER
RETREATS

TERMINATION UPON DEATH. Upon a Member's death, his or her Membership shall terminate. Within 180 days of written notice to the Club of the Member's death, the Club shall refund to the Member's estate an amount equal to the Member's Membership Deposit less the Resignation Fee and any outstanding amounts owing to the Club by the deceased Member. Should the deceased Member's designated Associate Member, if any, wish to continue using the Club, he or she may apply to join the Club under a new Membership for a new 30-year term. The Membership Deposit for the new Membership will be equal to the deceased Member's original Membership Deposit less the Resignation Fee if application is made within 90 days after the Club has returned to the Member's estate the applicable portion of the deceased Member's Membership Deposit. The Associate Member who applies within such 90-day time period may join as a Member upon approval of his or her Membership application and payment of the applicable Membership Deposit and will not be subject to any waiting list that may exist. Should the Associate Member choose not to join the Club or if the deceased Member did not designate an Associate Member, a deceased Member's adult child that is at least 25 years old may apply to join the Club under the same terms and conditions as a surviving Associate Member. This provision allowing a deceased Member's Associate Member or adult child to join for a reduced Membership Deposit and without regard to any waiting list shall not apply following the death of any such Associate Member or adult child who so becomes a Member.

All application requests in connection with the death of a Member must be in writing and will be subject to approval by the Club as determined in its sole discretion and conditioned upon payment of all outstanding balances owed to the Club by the deceased Member.

LEGAL SEPARATION, DIVORCE OR OTHER RELATIONSHIP TERMINATIONS. Membership is vested in the Member. The Member is responsible for informing the Club of any legal separation, divorce or termination of a common law marriage or domestic partner relationship. If a Member has any such legal separation or relationship termination, the Membership will remain with the Member and the Member's former Partner, regardless of whether that person is or was an Associate Member, will cease to have any rights or benefits of Membership. However, the Club will recognize the resignation of the Member's Membership

and a transfer of the right to receive the return of the applicable portion of the Member's Membership Deposit if resignation due to legal separation or divorce is requested in writing by the Member or the right to return of the Member's Membership Deposit is awarded to a Member's former Partner pursuant to a legally binding, permanent separation agreement, divorce decree or the equivalent provided to the Club. In such a case, the Club will pay to such former Partner an amount equal to the Member's Membership Deposit less the Resignation Fee and any amounts then due and owing by the Member to the Club. Should such former Partner wish to join the Club, he or she may apply to join the Club under a new Membership for a new 30-year term. The Membership Deposit for the new Membership will be equal to the resigned Member's original Membership Deposit less the Resignation Fee if application is made within 90 days after the Club has paid to the former Partner the applicable portion of the resigned Member's Membership Deposit. The former Partner who applies within such 90-day time period may join as a Member upon approval of his or her Membership application and payment of the applicable Membership Deposit and will not be subject to any waiting list that may exist. This provision allowing a Member's former Partner to join for a reduced Membership Deposit and without regard to any waiting list shall not apply following any legal separation or divorce or other relationship termination from such former Partner.

All application requests in connection with the legal separation or divorce of a Member must be in writing and will be subject to approval by the Club as determined in its sole discretion and conditioned upon payment of all outstanding balances owed to the Club.

INVOLUNTARY TERMINATION. The Club may, in its sole discretion, terminate any Member's Membership in accordance with the Rules and Regulations. Any Member who has his or her Membership involuntarily terminated will be deemed to have submitted a resignation notice to the Club in accordance with Section 8 as of the date of the Club's notice of termination and shall be suspended from all of the Club's rights and privileges until the termination is effective. The termination will be effective as if the Member had resigned in accordance with Section 8 and the terminated Member will be entitled to receive a refund of the portion of his or her Membership Deposit determined in accordance with Section 8.

DREAM CATCHER
RETREATS

SPECIAL TERMINATION. Upon 60 days notice to the affected Member, the Club may terminate, for any reason or no reason, a Member's Membership by returning the terminated Member's Membership Deposit as if that Member had resigned in accordance with Section 8.

WIND-DOWN AND TERMINATION. The Club may determine to wind down and terminate the Club if, in its opinion, the number of Membership terminations without corresponding Membership sales do not allow the Club to be cost-effectively operated. In such case, the Club will commence a wind-down and liquidation of its assets as deemed appropriate in its sole discretion. After ~~payment~~ of all liabilities, remaining assets will be distributed ~~to the Members. However, in no event will any Member be entitled to receive~~ more than the portion of his or her Membership Deposit ~~that the Member would have received had the Member voluntarily resigned in accordance with Section 8.~~

If the Club winds down and liquidates as provided in this Section 9, each Member hereby waives any and all rights and claims against the Club and its affiliate and related parties and each of their respective officers, directors, employees and agents for any monetary damages. A ~~Member's sole and exclusive remedy~~ will be the right to receive a pro-rata ~~share of the portion of the Member's~~ Membership Deposit ~~that the Member would have received had the Member vol-~~ untarily ~~resigned in accordance with Section 8 solely out of funds, if any, avail-~~ ~~able for distribution to the Members.~~

## 10. GENERAL PROVISIONS

SPONSORSHIP AND MANAGEMENT OF THE CLUB. The Club was formed and is sponsored and managed by the Club Operator and its affiliates. The Club is not a separate legal entity, and Members have no ownership rights in the Club, the Club Operator, any affiliate of the Club Operator, or any Club Property. Rather, Members have the right to use Club Properties in accordance with, and subject to, this Membership Plan, the Rules and Regulations, Membership Agreement and all other Membership Documents as in effect from time to time. The Club Operator and its affiliates have exclusive authority over the operation, management, governance and administration of the Club, Club Properties and Membership rights and obligations. This includes final, discretionary authority to

accept or reject potential Members; establish and change Membership categories, dues, fees and other amounts payable by Members; and amend, modify or waive any provision of the Membership Documents and rules and regulations relating to usage of Club Properties. The Club Operator and its affiliates may engage third parties to manage Club Properties.

SECURITY OF MEMBERSHIP DEPOSIT. The Club and its affiliates and related parties will at all times own Club Properties whose market value, (including furniture fixtures and equipment located at such Club Properties) as determined from time to time by independent appraisers or real estate professionals, will, together with cash and cash equivalents of the Club and its affiliates and related parties and deposits on properties to be purchased, less any outstanding debt which was incurred to finance the purchase of those Club Properties, equal or exceed 80% of the aggregate value of Membership Deposits received by the Club.

~~The Club will refund part or all of the Member's Membership Deposit in accordance with Sections 8 and 9 upon resignation or termination of Club Membership, as applicable.~~

TIMESHARE RISK. There is a risk that existing timeshare regulations in certain states will apply to the Club's non-equity membership structure. In some states, the definitions of "timeshare plan" and "timeshare interests" are so broad that they would include almost any right to use accommodations. In other states, a state regulator might conclude that the Club falls within that state's regulatory scheme, even though the Club may not technically fit within the state's "time share" definition. The Club will not attempt to register and may not seek a no-action letter or an exemption from timeshare registration in any state. Also, new state regulations may be implemented in the future that would directly apply to non-equity membership clubs, such as the Club. Neither the Club Operator, nor any other party has made any representation as to the consequences of such regulations.

If a state attempts to impose existing timeshare regulations or new regulations on the Club and its Members, the Club will attempt to communicate with the appropriate regulators and seek to distinguish the Club from typical timeshare products. The Club would also attempt to determine if changes to the Club's

DREAM CATCHER
RETREATS

# Exhibit E

QUINTESS
*The Leading Residences of the World*

July 6, 2007

Lorenz Fischer-Zernin

Dear Lorenz,

We are very pleased with the growth of the club and the commensurate growth in shareholder value. Managing the club has many different aspects to it and we are making improvements in many areas such as quality of the homes and service to improve member satisfaction.

Based on an extensive member survey, availability is a key issue for current members and also critically important to selling new memberships. Therefore management and the board have reviewed use of honorary membership days and decided on the following policy: Effective September 1, 2007 we will eliminate honorary memberships and honorary membership usage and allow any party who has honorary member privileges to purchase a full 30-day holiday charter membership for $300,000 and $20,000 in annual dues. The current market value of this membership is $395,000 and the redemption value of 80%, subject to our resignation rules, has an immediate current value of $316,000. The $20,000 of annual dues are far below today's market price of $27,500 for a similar membership. The dues are subject to normal and customary increases on an annual basis as are all annual dues of the club.

This change in policy will have an immediate positive impact to the availability ratios that are measured on a daily basis in the club. These ratios have been under pressure and management believes the increase in availability will have a positive impact on sales and member satisfaction.

We hope you will understand our rationale that this is a good business decision for the club and our stakeholders. We are very grateful for your support of the club and hope you will avail yourself of the membership pricing offer. This offer will remain open through September 1, 2007. Please do not hesitate to call if you would like to discuss this further.

Sincerely,

Bruce Barnet
Chairman
Club Holdings, LLC

Fax 203/7692322

203-7692364

quintess.com

Exhibit F

QUINTESS

*The Leading Residences
    of the World*

December 28, 2007

Lorenz Fischer-Zernin
Grand-Rue 34, 1204 Geneva
Switzerland

Dear Lorenz,

We, as I hope you, are very pleased with the growth of the Club and the commensurate growth in shareholder value. After the close of 2007, I will be following up with you as to the actual overall status of the Club. Managing the Club has many different aspects to it and we are making improvements in many areas such as quality of the homes and service to improve member satisfaction. You may recall that in July of this year you received a letter from our Chairman, Bruce Barnet, concerning your membership in the Club. Based on responses to that letter, including documentation that was not previously available to us and only provided to us after Bruce's letter being sent, we have carefully reviewed all of the relevant facts and are now able to provide you with a final resolution of this matter.

Your membership was created by membership documentation sent to you in August of 2006, just prior to the effective date of the merger between Club Holdings, LLC and Monogram Holdings, LLC (the "**Merger**"). The allocation of days that fund your membership, pursuant to the terms of the Merger, expire eighteen (18) months following the effective date of the Merger. Hence, the Club is obligated, pursuant to the terms of your membership documents which provide that the Club may, pursuant to several provisions, terminate your membership. By this letter, you are notified that your membership shall terminate in sixty (60) days but shall remain effective through February 29, 2008.

Any reservations that were made in accordance with our standard policies prior to the date of this letter will be honored as made. Moving forward and until February 29, 2008, you may make any reservations within the boundaries of your membership documentation and all such reservations will be honored. After February 29, 2008, you will no longer have the ability to make reservations and your membership will terminate.

Although your current membership is being terminated, based upon your historical support of the Club, Management and the Board have approved an offer for you to purchase a new membership at exceptionally favorable terms which are attached hereto as Exhibit A. This offer is available to you immediately and shall remain available to you until February 29, 2008. This offer is an extremely good value for a membership and provides for Charter rights in the Club that are no longer available for purchase by new members. I strongly encourage you to consider this offer. Again, we will make this offer available through February 29, 2008. Should you wish to accept this offer or, if you have any questions concerning the offer please do not hesitate to contact me at any time.

We truly hope that you will take advantage of the offer we have made for your ongoing membership. Thank you for your continued support and again, please do not hesitate to contact me with any questions.

Sincerely,

Pete Estler
CEO, Club Holdings, LLC
Cell: (303) 817-3566 Email: Pete@Quintess.com